## IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF MISSISSIPPI
## NORTHERN DIVISION

ALEXIS JEW,

*Plaintiff,*

v.

SAM DOBBINS, in his individual capacity and in his former official capacity as the Chief of Police of the Lexington, Mississippi Police Department; and

CHARLES HENDERSON, in his individual capacity and in his official capacity as interim and current Chief of Police of the Lexington, Mississippi Police Department,

*Defendants.*

Case No. [ 3:23-cv-2983-CWR-LGI ]

**COMPLAINT FOR DAMAGES AND PERMANENT INJUNCTIVE RELIEF**

**JURY TRIAL DEMANDED**

Plaintiff Alexis Jew, by her attorneys, brings this action for damages and permanent injunctive relief against Defendants Sam Dobbins and Charles Henderson. Plaintiff alleges, upon knowledge as to herself and otherwise upon information and belief, the following facts.

### INTRODUCTION

1.  The circumstances that led to this matter were decades in the making. The City of Lexington's Police Department (the "LPD") has a long history of terrorizing its historically disadvantaged, segregated, and majority-Black citizens. It thus came as no surprise when Lexington's Board of Aldermen appointed Defendant Sam Dobbins—a man with a well-documented history of discriminatory policing and excessive force against Black citizens across localities in Mississippi—as Chief of Police in July 2021.

2.  As Lexington Police Chief, Dobbins, who is white, built his own "feudal kingdom," characterized by discrimination and retaliation against the City's Black residents.

Defendant Charles Henderson—Dobbins's right-hand man and an officer known in his own right for inflicting violence on residents, particularly women—played a crucial role in perpetuating Dobbins's practices. Under Dobbins's and Henderson's watch and at their direction, the LPD has exhibited brutality, lawlessness, and racial animus toward the people of Lexington.

3.      Defendants have enriched themselves and their "kingdom" through a corrupt "Stop-and-Fine" policy. Pursuant to this policy, the LPD arrests people under false pretenses, slams phony charges on them, and forces them into paying hefty cash "fines" under threat of prolonged detention. This scheme is so pervasive and deeply entrenched in Lexington that it can only fairly be characterized as the official policy of the City of Lexington. As the City's coffers filled with revenue from Defendants' bogus fines, the City's Mayor and Board of Aldermen continued to ignore their citizens' cries for help. The City wasn't the only beneficiary of Defendants' "Stop-and-Fine" scheme; Dobbins pocketed plenty of cash himself. Dobbins boasted that he would rake in enough ill-gotten money to buy his colleagues new cars.

4.      On December 14, 2021, Dobbins and Henderson brutalized, imprisoned, and extorted Plaintiff Alexis Jew, a Black woman who grew up in Lexington, lived in nearby Greenwood, Mississippi when the events described herein took place, and currently lives in nearby Carrollton, Mississippi. Without reason or provocation, Dobbins and Henderson violently confronted Alexis while she was stopped at a gas station in Lexington. Alexis was not committing a crime; she was pumping gas while on her way to buy a Santa hat for her son's school Christmas play.

5.      None of this mattered to Dobbins and Henderson. They did not see Alexis as a citizen deserving of their protection, but as an object of exploitation—or as Dobbins put it, "easy

money." Within seconds of seeing Alexis, Defendants demanded to see her identification. When she asked what this was all about—a reasonable inquiry—Henderson violently accosted and handcuffed her. Alexis did not resist Defendants' commands, but that did not matter to them. According to Henderson, she was being "taught a lesson" for daring to question Defendants' authority.

6.      At the police station, Defendants slapped Alexis with a bogus "fine" of $1,283. They made clear that if she did not immediately pay up in cash, they would detain her for nearly two more weeks—through the Christmas holiday. If not for Alexis's sister doggedly pestering the LPD, the jail, and even Lexington's Mayor to petition for Alexis's release, and thereafter paying the demanded "fine" on Alexis's behalf, this may have been her fate.

7.      Adding further insult to injury, after over a year of unanswered calls about the status of her charges, Alexis discovered through her counsel a confusing, error-riddled arrest report claiming that she had been found "guilty in her absents [*sic*]" of charges stemming from her arrest, without any opportunity to contest those charges or recover her "fine." To be clear, there are no other records showing any judgment or conviction against her—and both the City of Lexington and the Lexington Municipal Court have represented that they have none. On information and belief, these sham "convictions" never took place.

8.       From being handcuffed, to being forced to spend a night in jail away from her family, and to being extorted into paying for crimes she did not commit and "convictions" that were never rendered, Alexis has suffered and continues to suffer injury.

9.      The police have a duty to protect and serve the citizens under their care. Yet the LPD under Dobbins and Henderson—who succeeded Dobbins as Chief—has terrorized and

pillaged Lexington's Black residents and others passing through. Alexis is neither the first nor the

most recent person to fall victim to the LPD's abuse. Without the Court's intervention, these

unconstitutional practices will continue.

## PARTIES

10.    Plaintiff Alexis Jew is a 41-year-old Black woman. Alexis was born and raised in

Lexington, Mississippi. She graduated from Lexington's J.J. McClain High School. At the time of

her arrest on December 14, 2021, Plaintiff lived in Greenwood, Mississippi. Alexis currently lives

in Carrollton, Mississippi.

11.    Defendant Sam Dobbins is the former Chief of the LPD. In his capacity as LPD

Police Chief, Dobbins—who is white—supervised the LPD's police officers. Dobbins's

responsibilities as Police Chief included establishing and maintaining policies and procedures

governing the LPD. As set forth in more detail below, Dobbins engaged in racist conduct and

discriminatory policing for at least a decade before he was appointed LPD Police Chief in July

2021, and Dobbins made discriminatory policing a hallmark of his tenure as Police Chief in

Lexington. On July 20, 2022, Lexington's Board of Aldermen voted 3–2 to terminate Dobbins as

Police Chief following the release of a seventeen-minute audio recording in which Dobbins used

racist and homophobic slurs to describe shooting victims and boasted of personally shooting and

killing Black citizens.

12.    Defendant Charles Henderson is a police officer with the LPD. Henderson is

Black. After Lexington's Board of Aldermen terminated Dobbins on July 20, 2022, it appointed

Henderson as Interim Chief. The Board has since appointed him Dobbins's successor as Chief of

Police. In that capacity, Henderson supervises the LPD's officers and establishes and maintains

LPD policies and procedures. Henderson, who was Dobbins's second-in-command and willingly

enforced Dobbins's discriminatory practices, lacks credibility with Lexington's Black residents as well. As set forth in more detail below, Henderson has reportedly engaged in brutality and violence against women in Lexington for years.

## JURISDICTION AND VENUE

13.    This civil-rights action arises under 42 U.S.C. § 1983 and is based on Defendants' violations of the Fourth and Fourteenth Amendments of the United States Constitution. This Court has subject-matter jurisdiction over this action pursuant to 28 U.S.C. § 1331 (federal-question jurisdiction) and 28 U.S.C. § 1343 (civil-rights jurisdiction). The Court can exercise supplemental jurisdiction over Alexis's state-law claim under 28 U.S.C. § 1367.

14.    The exercise of general and specific personal jurisdiction over Defendants comports with due process. Henderson resides in Mississippi and is therefore subject to general personal jurisdiction in Mississippi courts. Dobbins, while serving as LPD Police Chief, engaged in unconstitutional conduct in Mississippi that inflicted injuries on Alexis, a resident of Mississippi, giving rise to the claims asserted herein. Dobbins thus "commit[ted] a tort in whole or in part in this state" and "perform[ed] . . . work or service in this state," such that this Court may exercise specific personal jurisdiction over Dobbins under Mississippi's long-arm statute, MISS. CODE ANN. § 13-3-57 (2019). For the same reasons, Dobbins purposefully availed himself of the benefits of Mississippi such that this Court may exercise specific personal jurisdiction over him consistent with the Due Process Clause of the Fourteenth Amendment. Exercising jurisdiction over Dobbins would not offend traditional notions of fair play and substantial justice.

15.    Venue is proper in this District and Division under 28 U.S.C. § 1391(b). A substantial part of the events giving rise to Plaintiff's claims transpired in this District and Division—in Lexington, Holmes County, Mississippi.

# FACTUAL ALLEGATIONS

## I.   Race-Based Discrimination Features Prominently in Lexington's History and Institutions—Especially the LPD.

16.     Lexington is a small town in Holmes County, Mississippi. It is home to approximately 1,547 people. The City has a long history of segregation and race-based socioeconomic stagnation. Eighty-six percent of Lexington's population is Black, but many of Lexington's political leaders—including the Mayor, the municipal judge, and until recently the Police Chief—are white. The percentage of Lexington residents living in poverty is more than double the national average. In 1969, the United States Supreme Court ordered Lexington to end *de jure* segregation. *See Alexander v. Holmes Cnty. Bd. of Educ.*, 396 U.S. 1218 (1969) (Black, Circuit Justice). Over half a century later, the city's schools remain racially segregated on a *de facto* basis.

17.     Local law enforcement has long perpetuated this racial divide. As far back as 1963, the local sheriff's office employed violence—including firebombing and shooting—to prevent Lexington's Black residents from registering to vote. The LPD, a department with fewer than a dozen officers, is notorious for entrenching corruption, exploiting Lexington's Black residents, and settling personal grudges. The LPD acknowledged "problems with misconduct within our department" when it implemented a complaint-reporting system for Lexington residents in 2011. *See* Justin Purdy, *Lexington Police Offer Avenues For Complaints at Local Meeting*, Holmes County Herald (Aug. 18, 2011). Unfortunately, misconduct is still rampant.

18.     Lexington's Board of Aldermen appointed Sam Dobbins as Chief of the LPD in July 2021. At the time of his appointment, Dobbins had a well-documented history of racist comments and discriminatory policing. In 2013, Dobbins was terminated from his role as a

sheriff's deputy in Humphreys County, Mississippi, following a groundswell of complaints and lawsuits alleging that he engaged in discriminatory policing, used excessive force—Dobbins once beat a prisoner senseless without justification—and otherwise patrolled the county "like a feudal kingdom." Neirin Gray Desai, Samuel Boudreau, & Elena Debre, *Fired Lexington Police Chief Exposed in Racist Recording Had a Checkered Past in Law Enforcement*, Mississippi Center for Investigative Reporting (Aug. 16, 2022), https://www.mississippicir.org/news/fired-lexington-police-chief-exposed-in-racist-recording-had-a-checkered-past-in-law-enforcement. In another instance, a plaintiff sued Dobbins for allegedly arresting him based on false information that Dobbins provided to secure an arrest warrant and then refusing to release him from jail unless he paid a "turn key fee." *See* Complaint ¶¶ 10-13, *Roland v. Humphreys Cnty.*, No. 4:12-cv-00099-GHD-DAS (N.D. Miss. Oct. 12, 2012), ECF No. 1. [1]

19.      Prior to his stint with Humphreys County, Dobbins served as a police officer for the City of Yazoo, Mississippi, from 2008 through 2010—where he also had a reputation for racist comments and practices. The police chief who hired Dobbins in Yazoo City recalled that his assistant chief "wrote a lot of stuff up on Sam" during Dobbins's tenure there, including for "racial" conduct. Desai et al., *supra*. And a former deputy with the Yazoo County Sheriff's Department reported that Dobbins had a habit of calling Black officers "boy" and "n****r." *Id.*

---

[1] In another lawsuit, the plaintiff alleged that several Humphreys County Sheriff's Deputies, including Dobbins, separated her from her baby and detained her in a patrol vehicle while executing an unconstitutional search at her residence. Complaint ¶¶ 16-28, *Creel v. Humphreys Cnty.*, No. 4:12-cv-00089-MPM-JMV (N.D. Miss. Oct. 1, 2012), ECF No. 1. She alleged that "Dobbins snatched [her] arms behind her," "took her into custody[,] and made her sit in his patrol vehicle with her hands handcuffed behind her back for five and a half hours." *Id.* ¶ 26. During this detention, Dobbins allegedly "taunted the Plaintiff for her present, as well as past, choice[s] in boyfriends partially because the Plaintiff's daughter is multi-racial." *Id.* The plaintiff further alleged that the deputies who searched her home made off with $2,000 in cash. *Id.* ¶ 24.

20.    Dobbins doubled down on racism and discriminatory policing as Chief of the LPD. In or around April 2022, one of Dobbins's subordinates in the LPD surreptitiously recorded him using the words "f****t" (an anti-gay slur) and "n****r" repeatedly to describe suspects and criminal defendants. In this recording, Dobbins boasts of killing thirteen people as a police officer—including a Black man he claims to have shot 119 times. In Dobbins's cold-blooded words: "I shot that n****r 119 times."

21.    In Lexington, Dobbins built another "feudal kingdom" with the object of harassing, exploiting, and retaliating against Lexington's Black residents. In the recording referenced above, Dobbins lectures an LPD officer: "I don't give a fuck if you kill a motherfucker in cold blood. . . . I will articulate [*sic*] to fix the fucking problem. *And I'm the only man in the business here that's smart enough to do it.*"

22.    Henderson, as Dobbins's second-in-command, was part of the muscle behind Dobbins's discriminatory policies. Henderson has been the subject of numerous complaints in his own right—in one instance during an interrogation, Henderson allegedly picked up a handcuffed man and flipped him over a table. Henderson has also allegedly perpetrated violent acts against women in the community on multiple occasions, including by allegedly choking a woman and holding her against a wall by her throat after she requested a refund of a fine she had been forced to pay. In another instance, Henderson reportedly detained a woman for several months after she denied his sexual advances.

23.    In Dobbins's first and only year as Chief of the LPD, Lexington's Black residents reported numerous instances in which Dobbins or his subordinates, including Henderson,

arrested residents without provocation or justification, stopped residents on the streets and at road blocks without basis or under false pretenses, and jailed residents for bogus crimes.

## II.    Dobbins Implements a "Stop-and-Fine" Policy to Enrich Himself, His Friends, and the City of Lexington.

24.    Upon taking the job as Police Chief in 2021, Dobbins pledged to use his position to generate revenue for Lexington and to enrich himself and his fellow LPD officers. Dobbins reportedly promised to make a "million dollars" for Lexington by extracting fines from Lexington's primarily Black residents, and he boasted to colleagues that he would drum up enough cash to buy them new cars.

25.    To accomplish these ends, Dobbins devised, supervised, and implemented a "Stop-and-Fine" scheme by which he and his officers would—among other unconstitutional practices—stop and detain Lexington's Black citizens, arrest them on bogus charges, and coerce them into paying exorbitant and often arbitrarily imposed cash "fines" in exchange for their release from custody. As part of this scheme, Dobbins and the LPD told jail personnel that detainees had waived their initial appearances or preliminary hearings—meaning these people were not appearing before a judge and the LPD's threats of prolonged detention had teeth. Dobbins and his subordinates also refused to accept payments in any form other than cash, and often failed to provide receipts or documentation of the payments. Henderson, as Dobbins's second-in-command, was the primary enforcer of this "Stop-and-Fine" policy.

26.    Former LPD officers have corroborated this policy. For example, former LPD officer Ebony Huntly recounted that Dobbins personally instructed her to add false charges against a detainee for the purpose of extracting more money from her, and that Dobbins regularly added "resisting arrest" and "failure to comply" charges against individuals who neither resisted

nor failed to comply. Former LPD deputy Billy Reed has confirmed that Dobbins personally imposed excessive "fines" after each arrest, and that the LPD detained residents for days while their friends and family scrounged together enough cash to comply with Dobbins's demands.

27.    Dobbins's "Stop-and-Fine" scheme has borne fruit: In July 2021, Dobbins's first month on the job, Lexington's monthly revenue from traffic fines (issued for such alleged violations as failing to wear a seatbelt, following too close, and disturbing the peace) skyrocketed from roughly $2,500 the previous month to over $15,000. By March 2022, just eight months later, monthly revenue from traffic fines exceeded *$30,000*. That works out to about $20 *per resident*—in one month alone.



28.    According to an independent audit of the City of Lexington conducted pursuant to Mississippi law, the City had $70,749 in cash receipts from "[f]ines and forfeitures" during the fiscal year ending September 30, 2021. *See* Independent Auditor's Report 4 (Dec. 1, 2021),

https://www.osa.ms.gov/documents/municipalities/2021/21mLexington-cpa.pdf. The same independent auditor later reported that the City had $240,983 in cash receipts from "[f]ines and forfeitures" during the fiscal year ending September 30, 2022—an increase of *340%* from the prior year. *See* Independent Auditor's Report 5 (Mar. 20, 2023), https://www.osa.ms.gov/documents/municipalities/2022/22mLexington-cpa.pdf. Whereas Dobbins had only just taken the reins as Chief in September 2021, he held that position for nearly the entirety of the fiscal year ending September 30, 2022 (and Henderson served as Interim Chief for the last few months in that fiscal year).[2] Defendants' "Stop-and-Fine" scheme was well on its way to making good on Dobbins's promise of a "million dollars."

29.    These figures almost certainly *understate* the total amount Dobbins and Henderson have extorted. Dobbins kept the cash collected from Lexington residents in his own office, and that money reportedly "went missing" on several occasions. Defendants and their subordinates omitted these payments from Lexington's official records and coffers on a routine basis.

### III.    Dobbins and the LPD Double Down and Lash Out in the Face of Scrutiny.

30.    Dobbins's harassment and exploitation of Lexington's Black residents invited unwanted scrutiny. In Dobbins's first (and only) year as Police Chief, residents filed more than 200 complaints against the LPD with Lexington's Mayor and Board of Alderman, including complaints about Dobbins's cash "fine" policy. Mike Ludwig, *Mississippi Town Hired Racist Cop to*

---

[2] For reference, the City's independent auditor reported that Lexington had just $32,671 in cash receipts from "[f]ines and forfeitures" during the fiscal year ending September 30, 2019; and just $34,408 in cash receipts from "[f]ines and forfeitures" during the fiscal year ending September 30, 2020. *See* Independent Auditor's Report 6 (Apr. 28, 2020), https://www.osa.ms.gov/documents/municipalities/2019/19mLexington-cpa.pdf; Independent Auditor's Report 4 (Dec. 2, 2020), https://www.osa.state.ms.us/documents/counties/2020/20cLexington-cpa.pdf.

*Terrorize Black Residents, Advocates Say*, Truthout (Aug. 19, 2022), https://truthout.org/
articles/mississippi-town-hired-racist-cop-to-terrorize-black-residents-advocates-say. Residents
recorded several confrontations with Dobbins and/or the LPD on video or audio, and these
recordings became the grist for complaints, lawsuits, and further investigation by local and
national reporters and prominent civil rights organizations.

31.     Dobbins and his subordinates, including Henderson, responded with resistance
and indignation. For example, in a separate lawsuit before this Court, plaintiff Eric Redmond
alleges that he was falsely arrested when he went to the Lexington Police Station to post bail for
his sister, whom the LPD arrested the night before. Complaint ("*Harris* Complaint") ¶¶ 45-48,
*Harris v. Dobbins*, No. 3:22-cv-479-TSL-MTP (S.D. Miss. Aug. 16, 2022), ECF No. 1. Upon
arriving at the station, Redmond parked in a private lot near the precinct without blocking any
traffic. *Id.* ¶ 46. He left the station for a nearby ATM to get cash; while en route, his sister called
to inform him that the LPD had unilaterally raised her bail from $700 to $2,000. *Id.* Redmond
asked to speak with Dobbins to discuss why the bail had changed, but the arresting officer bristled
at the demand and refused to let him speak with Dobbins. *Id.* Redmond decided to wait outside of
the station to speak with Dobbins. *Id.* ¶ 47. While Redmond waited, a visibly angry LPD officer
approached and demanded that he leave. *Id.* Dobbins then appeared, directing the officer to arrest
Redmond. *Id.* The LPD arrested Redmond without justification and did not explain the reason for
his arrest, state the charges, or read his *Miranda* rights. *Id.* The charges against Redmond were
ultimately dropped. His ensuing lawsuit against the LPD is pending in this Court. *Harris v.
Dobbins*, 3:22-cv-479-TSL-MTP, 2023 WL 2899994, at *7-8 (S.D. Miss. Apr. 11, 2023).

32.    Yet another lawsuit filed in this Court alleges that Dobbins falsely arrested a Black

man named Javarius Russell following a New Year's Eve gathering on December 31, 2021. *See*

Complaint ("*Russell* Complaint") ¶¶ 41-53, *Russell v. City of Lexington*, No. 3:23-cv-500-DPJ-

FKB (S.D. Miss. Aug. 1, 2023), ECF No. 1. When an LPD police car pulled over Russell's

vehicle—supposedly for hitting a police car—Dobbins approached the car with his weapon

drawn, began shouting profanity at Russell, and promptly arrested him. *Id.* ¶¶ 43-48. Another

LPD officer arrived on the scene and informed Dobbins that Russell was not the person who hit

the police car, but Dobbins sent Russell to jail anyway. *Id.* ¶ 51. The LPD booked Russell on

trumped-up charges. *Id.* ¶¶ 54-56. At the police station, Dobbins offered Russell and another

arrestee a "deal": Dobbins would drop the charges and let them go if they paid him over $2,700

in cash. *Id.* ¶¶ 59-60. Henderson urged Russell to pay, saying Dobbins had offered a "good deal."

*Id.* ¶ 62. The LPD detained Russell through the holiday weekend. *Id.* ¶¶ 62-67.

33.    Under Dobbins's and Henderson's command, the LPD has also carried out its

"Stop-and-Fine" policy by regularly conducting discriminatory roadblocks—at times, five or six

per week. For instance, the LPD has reportedly conducted roadblocks following events at a

predominantly Black high school and in parts of town where residents are overwhelmingly Black.

If a Black driver does not have a driver's license or proof of insurance handy, the LPD reportedly

tows the vehicle and holds it on a cash bond. The LPD, in contrast, reportedly tends to issue

warnings to white drivers who lack a driver's license or proof of insurance.

34.    In short, the LPD under Dobbins and Henderson has regularly harassed and

exploited Lexington's Black citizens—including by implementing a discriminatory and

extortionate "Stop-and-Fine" policy.

**IV.    LPD Continues Its Reign of Terror After Dobbins is Disgracefully Dismissed.**

35.    Over the course of Dobbins's tenure, cries for relief from the LPD's reign of terror grew louder. Yet the City of Lexington refused to act as its coffers continued to fill with revenue from bogus fines. Lexington's Board of Alderman only voted to terminate Dobbins on July 20, 2022, after the seventeen-minute recording of Dobbins's racist diatribe was released. Even then, two Aldermen voted to retain Dobbins.

36.    The LPD's harassment continues unabated under Henderson. As a local news outlet recently reported:

> "We're at our breaking point," said Lexington resident Sherry Reeves.
>
> The retired educator said the department trumps up charges like the ones her son has been battling for over a year after a traffic stop.
>
> "I have four grown sons. Every time they leave their house or leave my house, I have anxiety," said Reeves. "Because I'm wondering if they're gonna be stopped, put a false charge on them or beat up or whatever. So this is what we've been dealing with."

Roslyn Anderson, *Lexington Residents Claim Constant Police Abuse and Terrorism*, WLBT ( June 13, 2023), https://www.wlbt.com/2023/06/13/lexington-residents-claim-constant-police-abuse-terrorism.

37.    The LPD under Henderson shows zero tolerance for lawful scrutiny from the community they serve, especially those who seek to hold them accountable. For example, on June 10, 2023, the LPD arrested civil-rights attorney Jill Collen Jefferson (counsel in the *Harris* case) on bogus grounds while she was lawfully filming a traffic stop from her car on a public street. Jerry Mitchell, *Lexington Police Jail Civil Rights Attorney Days After She Complained to Justice Official About Them*, Mississippi Today ( June 11, 2023), https://mississippitoday.org/2023/06/11/lexington-police-arrest-civil-rights-attorney.

38.     On May 4, 2023, former LPD officer Maytice Shields filed an affidavit with Mississippi Attorney General Lynn Fitch's Public Integrity Division, describing her experience on the force under Henderson. She states that in January 2023, she observed Henderson deleting bodycam footage of a traffic stop during which an LPD officer assaulted a woman. Shields alleges that when she ended what she described as a consensual relationship with him, Henderson responded with a barrage of violence and harassment. According to Shields, Henderson disciplined her at work, warned that he had people "watching" her, and in one instance choked her while pushing her against a wall. Shields claims she reported the assault to Mayor Robyn McCrory, but the mayor dismissed her without hearing her out.

**V.     The LPD's "Stop-and-Fine" Scheme is the City of Lexington's Policy.**

39.     The LPD's "Stop-and-Fine" Scheme, as effectuated during Dobbins's and Henderson's tenures with the LPD, is so widespread, common, and well-settled as to constitute a custom that fairly represents the City of Lexington's policy.

40.     When Dobbins took over as Police Chief in Lexington, he reportedly declared that he would make a "million dollars" for the City. The extent and effectiveness of Dobbins's "Stop-and-Fine" policy are evident from the City's revenues. As shown, revenue from traffic fines grew roughly *tenfold* during the first eight months of Dobbins's time as Chief. Under Dobbins and Henderson, the City's overall cash receipts from fines and forfeitures have grown by several hundred percent year-over-year as well. These dramatic increases in City revenue are a testament to—and would not be possible without—the LPD's widespread enforcement of the "Stop-and-Fine" policy.

41.     As shown, multiple former LPD officers have corroborated the prevalence and durability of the "Stop-and-Fine" policy.

42.    The LPD's pervasive abuses have triggered repeated complaints, lawsuits, and investigations against the LPD—and against Dobbins and Henderson specifically. As reported in local media, "Lexington residents say they have endured years of abuse by police officers." Anderson, *supra*. In June 2023, an official from the U.S. Department of Justice's Civil Rights Division traveled to Lexington, where she discussed law enforcement accountability with community leaders and stakeholders.

43.    Other City officials, including Lexington's Mayor and Board of Aldermen, have actual or constructive knowledge of the LPD's "Stop-and-Fine" policy. The Holmes County Sheriff has testified that he personally relayed complaints about the "Stop-and-Fine" policy and other discriminatory police practices from Lexington's Black citizens to Mayor Robin McCrory and the Board of Aldermen. TRO Hr'g Tr. 27:14-28:7, *Harris v. Dobbins*, No. 3:23-cv-479-TSL-MTP (S.D. Miss. Aug. 16, 2022), ECF No. 50. Black citizens have submitted complaints directly to the Mayor and Board of Aldermen, including specific requests that the "Stop-and-Fine" policy be put on the agenda of Board of Aldermen meetings. All said, hundreds of Black citizens have formally or informally complained about the harassment they have experienced at the hands of the LPD—including assaults, threats, false arrests, and baseless fines. *Harris* Complaint ¶¶ 30-32. And the City has been sued over the LPD's "Stop-and-Fine" scheme. *E.g.*, *Russell* Complaint ¶¶ 59-67; *Harris* Complaint ¶¶ 31, 55, 74, 86.

44.    The City's Mayor and Board of Aldermen are aware of the huge increase in revenue from fines and forfeitures Lexington has seen under Dobbins's and Henderson's tenures—a direct and tangible result of the LPD's pervasive "Stop-and-Fine" policy. These municipal leaders cannot plead ignorance: Dobbins himself sent monthly letters to "The City of

Lexington Mayor, Alderman, & Judge" detailing "fine collections" for the month, and the independent auditor's reports referenced above are addressed to the "Honorable Mayor and Board of Aldermen."

45.    The Police Chief is the final policymaker as to the LPD's policing practices and the conduct of the LPD's officers and personnel, including policies regarding the seizure, arrest, and detention of citizens in jail. Mississippi law provides that "[t]he marshal or chief of police shall be the chief law enforcement officer of the municipality and shall have control and supervision of all police officers employed by said municipality." MISS. CODE ANN. § 21-21-1 (2023); *see also In re: Roadside Safety Checkpoint Policy*, Op. No. 2011-00439, 2011 WL 5857740, at *1 (Miss. A.G. Oct. 28, 2011) ("The police chief of a municipality is the chief law enforcement officer, pursuant to Mississippi Code Section 21-21-1, and has the ultimate control and supervision of the municipal police department. Neither the mayor nor the board of aldermen have the authority to become involved in the day to day operations of the police department. . . . While aldermen, as the legislative arm of the municipality, have the authority to observe the activities of the police department, create positions, fix salaries and appropriate funds to the police department, they may not make law enforcement decisions, as such functions are executive in nature and are solely within the purview of the police chief."). Dobbins exercised this final policymaking authority during his time as Police Chief, including in the enforcement of the "Stop-and-Fine" policy against Alexis and others. Henderson exercised that same final policymaking authority as Interim Chief and currently exercises it as Police Chief. Pursuant to that final policymaking authority, Henderson has continued to enforce the "Stop-and-Fine" policy against Lexington's residents.

46.    Of course, even if the Police Chief were not the final policymaker as to the LPD's

policing practices under Mississippi law, the Mayor and Board of Alderman have alternatively

assumed this role. The Mayor and Board of Aldermen's failure to constrain the Police Chief in

any meaningful way makes clear that the City of Lexington has delegated any final policymaking

authority it may hold with regard to these practices to Dobbins and now to Henderson. In fact,

when counsel submitted a public records request to the City of Lexington for "[a]ll policies,

procedures, orders[,] directives[,] or similar records regarding bail and/or bond," "fines, fees,

court ordered debt, or similar obligations," the attorney for the City represented that "[n]one

exist." And when confronted with numerous complaints about the "Stop-and-Fine" policy,

neither the Mayor nor the Board of Aldermen issued any police regulations to abrogate that

policy.

47.    As governing authorities of Lexington, the Mayor and Board of Aldermen also

serve as final policymakers with respect to the remittance of fines and forfeitures, MISS. CODE

ANN. § 21-15-15 (2023), and the management and appropriation of City funds, MISS. CODE ANN.

§§ 21-17-5(1); 21-17-7 (2023). Despite their knowledge of the LPD's "Stop-and-Fine" policy, the

Mayor and Board of Aldermen have done nothing to remit the LPD's unlawful fines. Rather, as

stewards of the City's finances, the Mayor and Board of Aldermen knowingly oversaw the

management and appropriation of funds that the LPD unlawfully extorted from City residents.

48.    Moreover, the Mayor and Board of Aldermen have final policymaking authority

over the hiring and removal of the Chief of Police. MISS. CODE ANN. § 21-3-5 (2023). The Mayor

and Board of Aldermen exercised that authority when they hired Dobbins—a man with a history

of racism and brutality—as Police Chief. The Mayor and Board of Aldermen likewise exercised

that authority when they refused to remove Dobbins from his post, despite receiving formal and informal complaints of his false arrests, bogus fines, and other abuses. (The Board of Aldermen only removed Dobbins when the surreptitious recording was released, and even then, two Aldermen voted to keep Dobbins.) And the Mayor and Board of Aldermen exercised final policymaking authority over the hiring of the Chief of Police when they appointed Henderson, Dobbins's second-in-command and a key underwriter of the "Stop-and-Fine" scheme, first as Lexington's Interim Police Chief and then as its Chief.

## VI.    The LPD Deploys the "Stop-and-Fine" Policy Against Alexis.

49.    It was against this backdrop—the LPD's campaign of discriminatory policing, its scheme to leverage law enforcement powers to extract money from residents, and its sordid history of racism—that the LPD targeted Alexis.

50.    On the morning of December 14, 2021, Alexis traveled to Lexington to buy a Santa Claus hat for her son's school Christmas play and to visit her ailing grandmother, who was recovering from a stroke. Though Alexis no longer lived in Lexington, she visited her grandmother in Lexington nearly every day.

51.    That morning, Alexis stopped for gas at or around 302 Yazoo Street in Lexington. At the time, Alexis was driving a rented Dodge Ram pick-up truck with Texas license plates. Alexis parked at a pump and went inside the store, where her sister and niece happened to be present. Alexis paid $30 for gas and returned to the pump. While waiting for her tank to fill, Alexis returned to the convenience store to buy a refreshment. When Alexis realized she did not have any change to make a purchase, she went back outside—where she found Dobbins and Henderson standing behind her truck.

52.     Henderson and Dobbins each wore outerwear—Henderson a shirt and Dobbins a jacket—displaying "POLICE" on the back. Alexis could see each of Henderson's and Dobbins's badges and walkie-talkies.

53.     Alexis had not done anything to arouse suspicion or to invite police attention. She had not acted in a disruptive, disorderly, or otherwise suspicious manner; she did not have any altercations with anyone at or around the gas station; no one had confronted her or asked her to leave. All she did was pay for gas.

54.     As Alexis reached the pump, Henderson immediately demanded that Alexis provide her driver's license. When Alexis politely asked who Henderson was and why he needed her license, Henderson did not answer her question. Instead, Dobbins—who was standing nearby—interjected: "When the police ask you to do something, you do it." Despite not being told why she needed to show her license, Alexis responded, "You right." At that point, before Alexis could even make a full turn to retrieve her license from her truck, Henderson suddenly grabbed her by the arm, pushed her onto the front of the passenger's side of a car parked next to Alexis's truck, and handcuffed her.

55.     Alexis pleaded with Henderson, saying, "Wait a minute, let me get my license." Instead of allowing Alexis to comply, Henderson forcibly spread Alexis's legs and attempted to stick his hand in the pocket of Alexis's form-fitting athletic pants to grab her wallet. Alexis begged, "Don't go in my pocket, don't go in my pocket"—a reasonable and justified response to Henderson's assault. But at no point did she attempt to flee or disobey Defendants' orders. Despite Alexis's compliance with his commands, Henderson told Alexis, "You are going to jail

for failure to comply." Neither Henderson nor Dobbins explained to Alexis why they accosted her in the first place. It's because they had no reason.

56.     As Henderson pushed Alexis onto the car and cuffed her hands behind her back, a crowd of onlookers—including Alexis's sister and niece—gathered. Alexis's niece began recording the incident on her smartphone, at which point Henderson yelled at both Alexis and the onlookers, "Y'all gonna quit playing with the police!" and "Imma show y'all today!"

57.     While handcuffed, Alexis asked her niece to retrieve another state-issued identification card—not her driver's license, which was in her truck—from her pocket. Dobbins threatened that if Alexis's niece retrieved the identification card, he would spray her niece with mace.

58.     As Henderson escorted Alexis to the police car, Alexis overheard Dobbins shout, in reference to her rented truck's license plates: "Oh yeah, Texas?! We finna get this one too!" Alexis verbally protested, "How you going to take my truck? You can't take my truck!" Before Henderson placed her in Dobbins's vehicle, Alexis directed her sister to drive the truck home.

59.     At the time of Alexis's arrest, neither Henderson nor Dobbins read Alexis her *Miranda* rights.

### VII.     Dobbins and Henderson Extort Plaintiff Into Paying Bogus Fines.

60.     While en route to the police station, Henderson asked Alexis for her name. Alexis, who had recently divorced her ex-husband, believed the identification card in her wallet still bore her ex-husband's last name (Gibson), and so she replied that her name was Alexis Gibson. Upon arriving at the police station, Henderson asked Alexis for her identification card, which she retrieved from her wallet in her pocket—while still handcuffed—and handed it to Henderson. Henderson noted that the card actually showed her maiden name, Alexis Jew. Without giving

Alexis a chance to explain, Henderson accused her of lying: "Oh, you're lying about who you are!" Alexis insisted, accurately, that she had not lied: "I'm not lying about who I am. I am who I say I am. I'm from here."

61.     Alexis tried to explain that the perceived discrepancy was due to her previous marriage and recent divorce, but Henderson ignored her. Alexis attempted to recount her deep roots in Lexington and explain that several of her family members lived in Lexington, but her explanations fell on deaf ears. Alexis pleaded with Henderson to be let free, explaining that she had to get back to Greenwood before 3:15 pm to pick up her son. Again, Henderson ignored her pleas.

62.     At that point, Dobbins came into the holding area of the police station, reviewed Henderson's paperwork regarding Alexis's arrest, and shouted to Henderson, "Easy money, easy money, twelve eighty-three, all cash, all cash." Alexis asked if Dobbins meant that she would have to pay $12.83. Henderson clarified that Alexis would have to cough up *$1,283 in cash* before the LPD would release her. When Alexis explained that she didn't have that much money, Henderson warned, "If you don't have that you're gonna be here until Christmas," which was nearly two weeks from then. At no point did Dobbins, Henderson, or anyone else explain to Alexis the basis for this "fine," nor did they offer her a bond to ensure her appearance at any future proceeding.

63.     At least 30 minutes later, after completing his paperwork, Henderson transported Alexis to the Holmes County Jail, where—according to Henderson—she would spend the next two weeks if she could not find some way to pay $1,283. While Alexis was being signed in at the jail, the employee processing her paperwork advised, "All you got to do is apologize [to Henderson]." Heeding this advice and desperate to get out of jail, Alexis told Henderson she was

sorry. Henderson responded, "Y'all think you gonna get me but you can get in line." He continued: "Yeah, y'all like using those cameras and recording and stuff. Y'all like to get the news people." Henderson threatened that he was "going to teach [her] something."

64.    Alexis was confused by what Henderson meant. She protested, "I don't have no camera. What are you talking about?" It was only after she was later released from jail that she realized Henderson was referring to her niece who had recorded part of the incident—which was her niece's First Amendment right.

65.    After Alexis was processed, jail personnel forced her to change her clothes and locked her in a cell. Alexis spent the rest of the night and the following morning in her cell crying and trying to find a way to get back to her son and grandmother. While she was being held in custody, Alexis met several other detained victims of the "Stop-and-Fine" policy, including a woman who claimed she had been arrested while simply walking with her son. During this time, Alexis's cousin Kendrick Noel Williams went to the LPD station to check on Alexis, but Dobbins falsely told Mr. Williams that Alexis was no longer in detention.

66.    The next morning, on December 15, 2021, another of Alexis's sisters, Querrida Johnson, visited the LPD station. Ms. Johnson, who lives in Chicago, had been visiting her family in and around Lexington. Ms. Johnson was about to board a return flight on December 14, 2021, when Alexis's father called her and asked her to help Alexis. Ms. Johnson missed her flight. When Ms. Johnson arrived at the station the next day, LPD personnel told her that Alexis did not have an option to pay a "bond" and would need to pay the full $1,283 if she wished to be released. At some point after hearing about her sister's arrest, Ms. Johnson also spoke on the phone with Mayor Robin McCrory, who told Ms. Johnson that she would not be able to pay a bond. With no

other option, Ms. Johnson met the LPD's demand, paid the entire amount in cash, and secured Alexis's release that morning. Neither Alexis nor her sister were given a receipt for the payment. Alexis was never brought before a judge regarding the purported fines or any charges.

67.     Alexis later reimbursed Ms. Johnson for the $1,283.

## VIII.  Defendants Deny Alexis the Opportunity to Contest Her Supposed Charges and Falsify Records to Paper Over the Absence of Legal Process.

68.     Upon releasing Alexis from the Holmes County Jail the morning of December 15, 2021, LPD personnel gave Ms. Johnson paperwork that instructed Alexis to appear at the Lexington Municipal Court on or around December 18, 2021. By the appointed date, however, Alexis had contracted COVID-19. Alexis nonetheless traveled to the courthouse as instructed, informed the court staff of her diagnosis, and came prepared with her driver's license and marriage certificate in the event she would still be called upon that day to explain the discrepancy between the names she gave to Henderson.

69.     Court staff instructed Alexis to wait outside the courthouse in her truck while they claimed to make copies of her driver's license, her marriage certificate, and the LPD documents reflecting Alexis's scheduled court date. Shortly thereafter, the same court staff returned Alexis's driver's license and marriage certificate, instructed her to go home, and advised her that someone would reach out to her about the pending charges. The court staff did not return the document Alexis had received from the LPD instructing her to come to the courthouse on that date.

70.     As of the date of this Complaint, no one from the LPD or the Lexington Municipal Court has ever initiated contact with Alexis regarding a new court date or the status of any charges against her. Alexis has never been arraigned on any criminal charge or otherwise appeared before a judge in connection with this incident.

71.     After more than a year of unanswered calls to the LPD inquiring about the status of her case, Alexis finally connected with staff from the Lexington Municipal Court in November 2022. The court staff informed her that she had already been charged with and found guilty of "obstruction of justice" and providing false information to the police, and that she had already paid the requisite fines. As shown below, these convictions are fictitious—Alexis received no notice of the purported charges against her, no opportunity to defend herself against these bogus charges, or any other form of due process.

72.     Plaintiff's counsel have since obtained a purported arrest report for this incident, attached hereto as Exhibit A (the "Arrest Report"). The Arrest Report states that Alexis was "found guilty" in absentia. According to the Arrest Report, a proceeding supposedly took place on December 30, 2021, before Judge Marc Boutwell of the Lexington Municipal Court, in which the court allegedly "found [Alexis] guilty in her absents [*sic*]" of disorderly conduct and providing false identifying information. The Arrest Report states that a "cash bond [was] posted toward [her] fine." The entry in the Arrest Report appears as follows:



73.     The Arrest Report states that Alexis paid $659.25 as a "fine plus assessments" for the false-identifying-information charge, and $624.25 as a "fine plus assessments" for the disorderly-conduct charge. Added together, these fees come to $1,283.50—corresponding to the $1,283 that Defendants required Ms. Johnson to pay before they released Alexis from jail.

74.    The Arrest Report is riddled with falsehoods and inconsistencies. For one, prosecutors never formally charged Alexis, much less brought her before a judge for an arraignment or provided her an opportunity to contest her charges. The Arrest Report includes a field for "Pros Attorney," but does not identify any prosecutor; the field is left blank. And while the Arrest Report claims Alexis was "found guilty in her absents," the "Failed to Appear" box is unchecked.

75.    It gets worse. The Arrest Report does not even consistently identify the supposed charges against Alexis. For example, pages one and two of the Arrest Report each identify the supposed charges as "Failure to Obey Officer" and "False Information." But page five varyingly claims Plaintiff was charged with "Disorderly conduct" or "Misdemeanor Assault," not "Failure to Obey Officer." And none of these trumped-up charges corresponds to the supposed "obstruction of justice" charge that court staff verbally identified to Alexis in November 2022.

76.    Contrary to what is written in the Arrest Report, the LPD forced Alexis to pay her "fines" in full—not as a "cash bond" as depicted and set forth above—before any supposed judicial process could begin and before she was released from jail. The $1,283.50 sum that Defendants collected from Ms. Johnson on December 15, 2021, was contemporaneously recorded in LPD documentation as "fines" and "assessments," not as a bond. In fact, that *same day*, the LPD deposited the cash collected from Ms. Johnson in the LPD's account at Holmes County Bank. If the money were a bond, it would have been filed with the clerk of court. *Cf.* Miss. R. Crim. P. 5.1(b)(2), 8.7(b). That the LPD immediately deposited the money in its own bank account underscores that this was simply a shakedown.

77.    The Arrest Report's "narrative" section—which is unsigned but tellingly written in the first person from Henderson's perspective—asserts that Dobbins and Henderson went to the gas station to respond to a call that "a female wouldn't leave the property as instructed," and that when Defendants arrived, the owner of the station "advised [them that] the unknown female had been blocking the pump for approximately 45 minutes." But no one at the gas station asked Alexis to leave, and Alexis was not pumping gas for more than ten minutes. And neither Alexis, her sister, nor her niece witnessed any other "female" at the gas station who "wouldn't leave" or who was "blocking the pump." This "narrative" is fiction.

78.    The narrative section of the Arrest Report also claims that Alexis "told [Defendants] that she was leaving," and that when they "attempted to place[] her in hand cuffs[,] . . . she tried snatch her arms way." This is false—Alexis never said she was leaving, and Henderson handcuffed her while she was attempting to comply with the officers' unwarranted demands.

79.    Alexis has not received any notice, any opportunity to be heard, or any other process in connection with her arrest. Nor has Alexis been served or otherwise provided with any judgment supposedly rendered against her. Aside from the falsehood-ridden Arrest Report, there is no record of Alexis's purported conviction—none. In response to a public records request under Mississippi Public Records Act of 1983, MISS. CODE ANN. §§ 25-61-1 *et seq.* (2023), the City of Lexington and the Lexington Municipal Court have represented that they do not possess any certificates of disposition reflecting Alexis's purported charges, nor any other confirmation of conviction based on Alexis's arrest. Public records searches likewise do not show any record of any charges or convictions against Alexis relating to this incident.

80.     On information and belief, Alexis was never actually convicted of any charge in connection with her December 14, 2021, arrest or her ensuing detention. As shown, Alexis never received any notice of the supposed December 30, 2021, court hearing; Defendants made clear to Alexis and her sister that the money they collected from Alexis was not a bond, and far from treating Alexis's money as a bond, the LPD immediately deposited the cash in its own bank account; the LPD's own falsehood-ridden documents do not consistently identify the supposed charges against Alexis; Alexis has never received any record of any supposed judgment rendered against her; there is no public record of any charge or conviction against Alexis relating to the December 2021 incident; and by their own admission, neither the City of Lexington nor the Lexington Municipal Court has any record of any charges against Alexis relating to the December 2021 incident or any record of any conviction for those supposed charges. On information and belief, Defendants (or subordinates acting at Defendants' direction) fabricated information in the Arrest Report to retroactively justify, and to give a veneer of legality to, their unlawful extortion of $1,283 from Alexis.

## IX.     Alexis Has Suffered Emotional, Physical, and Monetary Harm.

81.     As a direct and proximate result of Defendants' unlawful conduct, Alexis has sustained emotional, physical, and monetary injuries.

82.     Alexis remains traumatized by her arrest and subsequent extortion at the police station. Defendants manhandled and handcuffed Alexis without cause, and Dobbins threatened to attack her niece with mace if she dared help Alexis retrieve her identification card, even though Henderson had demanded that Alexis provide identification. Defendants forced Alexis to spend a night in jail—where she cried all night—away from her son and grandmother, and then extorted Alexis into paying money she did not have under the threat of a lengthy detention as punishment

for crimes that she did not commit. As a direct result of this experience, Alexis suffers from trauma and anxiety that interfere with her daily life and have manifested most notably in fear and paranoia while visiting Lexington. For example, Alexis cannot travel through the city without thinking she is being followed. Alexis also sought counseling from her pastor and his wife to deal with the trauma, and has prayed about her experience in an effort to reduce her anxiety.

83.     Alexis also suffered headaches and nausea as a result of Henderson pinning her arms behind her back, pushing her onto the side of a car, and handcuffing her. Henderson invaded Alexis's physical space when he spread her legs apart and began to forcefully touch her leg to reach into her pocket.

84.     Alexis repaid Ms. Johnson the $1,283 she advanced to secure Alexis's release. The LPD never repaid Alexis or Ms. Johnson for this bogus "fine."

## X.    Alexis Faces a Substantial Likelihood of Future Injury.

85.     Alexis also faces a substantial likelihood of future injury at the hands of Henderson and the LPD. She travels to Lexington to visit family. Given Lexington's small size, future encounters with Henderson and the LPD are inevitable.

86.      Alexis, as a Black woman, remains a target of the LPD's discriminatory animus under Henderson's control. There is a real and immediate threat that Henderson or officers under his command will subject Alexis to the same policy that she and other Black female citizens have endured—unreasonable searches and seizures, excessive force, false arrests, bogus and excessive fines, indefinite detention, and other harassment.[3]

---

[3] That Henderson is also Black does not make future harassment any less likely. As one of Lexington's Black residents aptly put it, "Henderson was one of Dobbins's henchmen. He was going around at the chief's instructions harassing people." Earnest McBride, *Lexington Uncertain of Future Now That It's Rid of Racist Police Chief,* Jackson Advocate (Aug. 1, 2022),

87.    The LPD under Dobbins and Henderson has also shown a propensity to retaliate against those who speak out against the LPD's misconduct. In June 2022, for instance, the LPD falsely arrested Eric Redmond in retaliation for asking to speak with Dobbins about his sister's increase in bail, as shown above. *See Harris* Complaint ¶¶ 45-48. And on June 10, 2023, the LPD arrested activist and attorney Jill Collen Jefferson for engaging in her First Amendment-protected right of filming a traffic stop involving a Black motorist. *See* Mitchell, *supra*.

88.    Alexis has already been subjected to the LPD's retaliation once. As explained, when Henderson arrested Alexis at the gas station, Alexis's niece took a short video recording of the incident. Henderson lashed out: "Imma show y'all today!" Later, when Alexis explained that she could not pay the exorbitant "fine" and pleaded with Henderson to be let free, Henderson made clear that his refusal was retaliatory: "Yeah, y'all like using those cameras and recording and stuff. Y'all like to get the news people." Henderson threatened that he was "going to teach [Alexis] something." Alexis cannot afford another "lesson" at Henderson's hands.

89.    With the filing of this Complaint and ongoing scrutiny of the LPD's past and ongoing crimes and other misconduct, there is no reason to believe Defendants will relent and cease their retaliation.

---

https://jacksonadvocateonline.com/lexington-uncertain-of-future-now-that-its-rid-of-racist-police-chief.

## CLAIMS FOR RELIEF

## COUNT I (42 U.S.C. § 1983)

**Unreasonable Search and Seizure in Violation of the
Fourth and Fourteenth Amendments
(asserted against Defendants in their individual and official capacities)**

90.     Alexis incorporates by reference and realleges all prior paragraphs of this

Complaint and the paragraphs in the counts below as though fully set forth herein.

91.     42 U.S.C. § 1983 provides that:

Every person who, under color of any statute, ordinance, regulation, custom or
usage, of any State or Territory or the District of Columbia, subjects, or causes to
be subjected, any citizen of the United States or other person within the
jurisdiction thereof to the deprivation of any rights, privileges, or immunities
secured by the Constitution and laws, shall be liable to the party injured in an
action at law, suit in equity, or other proper proceeding for redress . . . .[4]

92.     By stopping Alexis and demanding that she provide identification, Defendants

deprived Alexis of her clearly established right to be free from unreasonable searches and seizures

under the Fourth Amendment, as made applicable to the states by the Due Process Clause of the

Fourteenth Amendment.

---

[4] Congress passed this statute as Section 1 of the Civil Rights Act of 1871. As enacted, the statute
read as follows: "any person who, under color of any law, statute, ordinance, regulation, custom,
or usage of any State, shall subject, or cause to be subjected, any person within the jurisdiction of
the United States to the deprivation of any rights, privileges, or immunities secured by the
Constitution of the United States, shall, *any such law, statute, ordinance, regulation, custom, or usage
of the State to the contrary notwithstanding*, be liable to the party injured in any action at law, suit in
equity, or other proper proceeding for redress . . . ." 17 Stat. 13, § 1 (1871) (emphasis added). The
italicized language was inexplicably omitted from the first compilation of federal law in 1874 and
from the first publication of the United States Code in 1926. *See Rogers v. Jarrett*, 63 F.4th 971,
979-81 (5th Cir. 2023) (Willett, J., concurring). This "error, whether one of omission or
commission, has never been corrected." *Id.* at 980.

93.     It is clearly established that an officer may not conduct a warrantless seizure or detention of an individual "on the street" absent "reasonable suspicion that criminal activity is afoot." *United States v. McKinney*, 980 F.3d 485, 490 (5th Cir. 2020).

94.     An officer "seizes" an individual when (a) the officer makes a show of authority and (b) the individual submits to that show of authority. *United States v. Wright*, 57 F.4th 524, 530-31 (5th Cir. 2023). Submission to a show of authority depends on whether a plaintiff "objectively appeared to believe [s]he was not free to leave." *Id.* at 533. Reasonable suspicion must be supported by "particular and articulable facts, which, taken together with rational inferences from those facts, reasonably warrant an intrusion." *Gonzalez v. Huerta*, 826 F.3d 854, 856 (5th Cir. 2016).

95.     Henderson "seized" Alexis the moment he demanded her for identification at the gas station. Henderson's command, along with Defendants' display of "POLICE" on their outerwear, the outward display of their badges, and their visible walkie-talkies, constituted a sufficient show of authority that no reasonable person would understand that they were free to leave the gas station. When Dobbins yelled, "When the police ask you to do something, you do it," Alexis did not attempt to leave or otherwise show defiance; to the contrary, she indicated she would comply with Henderson's demand by retrieving her license from her truck. *See Wright*, 57 F.4th at 532-33 (holding criminal defendant was "seized" under the Fourth Amendment, notwithstanding his refusal to comply with a police officer's order to stay in the car, because the defendant "d[id] not show defiance," but rather exited the car slowly, turned to the officer with arms extended, and stated he did not do anything).

96.    This seizure was unreasonable and conducted with reckless indifference for Alexis's constitutional rights, in that neither Dobbins nor Henderson had specific, articulable facts suggesting Alexis's involvement in any crime. When Henderson asked for Alexis's identification, Alexis had just stepped out of a convenience store at a gas station; she was not behaving violently or disruptively, she was not loitering, and she was not causing any disturbance. She had been present at the gas station for no longer than ten minutes, and nobody had asked her to hurry up at the pump or to leave the gas station.

97.    Alexis attempted to comply with Defendants' demands to identify herself, despite Defendants' lack of reasonable suspicion that she committed a crime.[5] Of course, police officers may not arrest an individual for failing to "give [her] ID card without reasonable, articulable suspicion that [she] was engaged in criminal activity." *Grosch v. Tunica Cnty.*, No. 2:06CV204-P-A, 2008 WL 114773, at *8 (N.D. Miss. Jan. 8, 2008). As shown, Defendants did not have any reasonable, articulable suspicion that Alexis was engaged in criminal activity.

98.    Defendants unlawfully stopped and seized Alexis in accordance with and in furtherance of their "Stop-and-Fine" policy.

99.    In depriving Alexis of her rights under the Fourth Amendment, Defendants acted with evil intent and reckless indifference for Alexis's constitutional rights under color of law in their respective capacities as Lexington police officers, and their actions and omissions were

---

[5] Even if Alexis had not complied, her verbal disagreement would not give rise to a reasonable suspicion that would justify a seizure. *See, e.g.*, *Florida v. Bostick*, 501 U.S. 429, 437 (1991) (stating the Court has consistently held that "refusal to cooperate, without more, does not furnish the minimal level of objective justification needed for a detention or seizure"); *Florida v. Royer*, 460 U.S. 491, 497-98 (1983) (stating that an individual has a right to ignore the police when an officer approaches an individual without reasonable suspicion or probable cause).

conducted within the scope of their respective official duties or employment. This deprivation

under color of law is actionable under, and may be redressed by, 42 U.S.C. § 1983.

## COUNT II (42 U.S.C. § 1983)

### False Arrest in Violation of the Fourth and Fourteenth Amendments
### (asserted against Defendants in their individual and official capacities)

100.    Alexis incorporates by reference and realleges all prior paragraphs of this

Complaint and the paragraphs in the counts below as though fully set forth herein.

101.    By arresting Alexis without probable cause, Defendants deprived Alexis of her

clearly established right to be free from unreasonable searches and seizures under the Fourth

Amendment, as made applicable to the states by the Due Process Clause of the Fourteenth

Amendment.

102.    It is clearly established that a warrantless arrest is objectively unreasonable if the

arresting officer lacks probable cause. *United States v. Watson*, 423 U.S. 411, 417-24 (1976);

*Davidson v. City of Stafford*, 848 F.3d 384, 391 (5th Cir. 2017).

103.    "Probable cause is established by facts and circumstances within the officer's

knowledge that are sufficient to warrant a prudent person, or one of reasonable caution, in

believing, in the circumstances shown, that the suspect has committed, is committing, or is about

to commit an offense." *Arizmendi v. Gabbert*, 919 F.3d 891, 897 (5th Cir. 2019) (quotation

omitted). This standard incorporates the "expertise and experience of the law enforcement

officials." *United States v. Nunez-Sanchez*, 478 F.3d 663, 667 (5th Cir. 2007) (citation omitted).

104.    No facts or circumstances could have existed within either Defendant's knowledge

at the time of Alexis's arrest that would have been sufficient to warrant a reasonable person

believing she had committed any crime.

105.     According to the Arrest Report, Defendants went to the gas station in response to a complaint about a customer who refused to leave the premises after staying there for approximately forty-five minutes. The Arrest Report also claims the owner identified Alexis as the culprit to Defendants when they arrived on the scene. But as shown, these "facts" are fictions—nobody asked Alexis to leave the station; she did not spend longer than ten minutes at the pump before Defendants confronted her; she never interacted with the owner of the gas station, other than possibly to pay for gas; and she did not observe anyone from the gas station identify her to Defendants. For the same reasons, even if the owner did place a call to the LPD, no reasonable police officer could have believed Alexis to be the individual the gas station owner complained of.

106.     Nor could a reasonable police officer under the circumstances have believed Alexis engaged in disorderly conduct by failing to provide her identification upon request—failure to provide identification to police upon request is not a crime in Mississippi. *Mastin v. State*, 180 So. 3d 732, 737 (Miss. Ct. App. 2015). That is, police officers may not ask a person to "give [her] ID card without reasonable, articulable suspicion that [she] was engaged in criminal activity." *Grosch*, 2008 WL 114773, at *8. As shown, Defendants lacked reasonable suspicion that Alexis was doing anything beyond pumping gas.

107.     A reasonable police officer under the circumstance could not have believed that Alexis provided false information to Henderson at the time of Alexis's arrest, because Alexis did not give Henderson her name until well after Henderson arrested, handcuffed, and placed her in a police vehicle.

108.    Defendants unlawfully arrested Alexis in accordance with and in furtherance of their "Stop-and-Fine" policy.

109.    In depriving Alexis of her rights under the Fourth Amendment, Defendants acted with evil intent and reckless indifference for Alexis's constitutional rights under color of law in their respective capacities as Lexington police officers, and their actions and omissions were conducted within the scope of their respective official duties or employment. This deprivation under color of law is actionable under, and may be redressed by, 42 U.S.C. § 1983.

## COUNT III (42 U.S.C. § 1983)

### Unreasonable Search Incident to Arrest in Violation of the
### Fourth and Fourteenth Amendments
### (asserted against Defendants in their individual and official capacities)

110.    Alexis incorporates by reference and realleges all prior paragraphs of this Complaint and the paragraphs in the counts below as though fully set forth herein.

111.    Defendants' pat-down of Alexis's legs and attempted entry into Alexis's pockets during her arrest deprived Alexis of her clearly established right to be free from unreasonable searches and seizures under the Fourth Amendment, as made applicable to the states by the Due Process Clause of the Fourteenth Amendment.

112.    It is clearly established that a search incident to an arrest is unconstitutional if the arrest itself was without probable cause. *Club Retro, L.L.C. v. Hilton*, 568 F.3d 181, 208 (5th Cir. 2009) (holding search incident to arrest violated plaintiffs' rights where officers lacked probable cause for arrest and law was clearly established regarding the violations).

113.    Henderson, by spreading Alexis's legs apart after handcuffing her and then repeatedly reaching for Alexis's wallet in her pants pocket, engaged in a search incident to a custodial arrest that—as set forth above—lacked probable cause.

114.    Defendants unlawfully searched Alexis in accordance with and in furtherance of their "Stop-and-Fine" policy.

115.    In depriving Alexis of her rights under the Fourth Amendment, Defendants acted with evil intent and reckless indifference for Alexis's constitutional rights under color of law in their respective capacities as Lexington police officers, and their actions and omissions were conducted within the scope of their respective official duties or employment. This deprivation under color of law is actionable under, and may be redressed by, 42 U.S.C. § 1983.

## COUNT IV (42 U.S.C. § 1983)

### Excessive Force in Violation of the Fourth and Fourteenth Amendments
### (asserted against Defendants in their individual and official capacities)

116.    Alexis incorporates by reference and realleges all prior paragraphs of this Complaint and the paragraphs in the counts below as though fully set forth herein.

117.    By forcefully placing Alexis in handcuffs, shoving her onto the nearby car, and spreading and patting down her legs to get to her pockets, Defendants deprived Alexis of her clearly established right to be free from excessive force during a search or seizure under the Fourth Amendment, as made applicable to the states by the Due Process Clause of the Fourteenth Amendment.

118.    "To prevail on an excessive force claim, a plaintiff must show '(1) an injury that (2) resulted directly and only from the use of force that was excessive to the need and that (3) the force used was objectively unreasonable.'" *Sam v. Richard*, 887 F.3d 710, 713 (5th Cir. 2018) (quoting *Hamilton v. Kindred*, 845 F.3d 659, 662 (5th Cir. 2017)).

119.    "[A]s long as a plaintiff has suffered some injury, even relatively insignificant injuries and purely psychological injuries will prove cognizable when resulting from an officer's

unreasonably excessive force." *Id.* "The objective reasonableness of the force, in turn, depends on the facts and circumstances of the particular case, such that the need for force determines how much force is constitutionally permissible." *Bush v. Strain*, 513 F.3d 492, 501 (5th Cir. 2008). The relevant facts and circumstances that govern the need for force include "the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether [s]he is actively resisting arrest or attempting to evade arrest by flight." *Id.* (citation omitted).

120.    It was clearly established at the time of Plaintiff's arrest "that pushing, kneeing, and slapping a suspect who is neither fleeing nor resisting is excessive." *Sam*, 887 F.3d at 714. It was also clearly established that forcefully pushing a suspect into a vehicle "when [the suspect is already] handcuffed and subdued" is excessive under the Fourth Amendment. *Bush*, 513 F.3d at 501.

121.    No reasonable officer could have believed that the facts and circumstances leading up to Alexis's arrest warranted the degree of force employed against her, which included roughly placing handcuffs around Alexis's wrists, shoving Alexis's face and body forward onto the side of a car, and intrusively spreading open her legs for identification that Defendants had no right to see, all in front of a crowd of people. Even assuming Defendants suspected that Alexis was loitering at the gas station—and, as shown, they had no reasonable basis for that suspicion— Alexis was plainly not a danger to herself or others. Alexis was neither fleeing nor resisting arrest, and she was already handcuffed and subdued when Henderson shoved her body into the vehicle. In short, it would have been clear to any objective, reasonable officer that no force was necessary at all.

122.     Alexis's injuries as a result of the arrest are more than *de minimis*. Her injuries include headaches, nausea, and disorientation from being shoved onto a vehicle, and psychological trauma from being stopped arbitrarily and subjected to intensive searches of her body in front of a crowd. As shown, Alexis continues to suffer from crippling fear and paranoia while visiting Lexington.

123.     Defendants unlawfully used force against Alexis in accordance with, and in furtherance of, their "Stop-and-Fine" policy.

124.     In depriving Alexis of her rights under the Fourth Amendment, Defendants acted with evil intent and reckless indifference for Alexis's constitutional rights under color of law in their respective capacities as Lexington police officers, and their actions and omissions were conducted within the scope of their respective official duties of employment. This deprivation under color of law is actionable under, and may be redressed by, 42 U.S.C. § 1983.

## COUNT V (42 U.S.C. § 1983)

### Excessive Detention Without Probable-Cause Hearing in Violation of the Fourth and Fourteenth Amendments
### (asserted against Defendants in their individual and official capacities)

125.     Alexis incorporates by reference and realleges all prior paragraphs of this Complaint and the paragraphs in the counts below as though fully set forth herein.

126.     By unreasonably denying Alexis a prompt probable-cause hearing before a neutral magistrate while she was detained in the Holmes County Jail, Defendants deprived Alexis of her clearly established right to be free from unreasonable searches and seizures under the Fourth Amendment, as made applicable to the states by the Due Process Clause of the Fourteenth Amendment.

127.    It is clearly established that depriving a warrantless arrestee of a prompt probable-cause determination violates the Fourth Amendment when the delay or denial is "for the purpose of gathering additional evidence to justify the arrest, a delay motivated by ill will against the arrested individual, or [a] delay for delay's sake." *Cnty. of Riverside v. McLaughlin*, 500 U.S. 44, 56 (1991); *see also Brown v. Sudduth*, 675 F.3d 472, 477-81 (5th Cir. 2012).

128.    Defendants detained Alexis for approximately twenty hours without any reasonable basis for failing to present her for a probable-cause hearing. Defendants never represented to Alexis that a magistrate was unavailable, nor was Alexis intoxicated or otherwise disorderly such that holding her in jail overnight would have been appropriate. *Cf. White v. Taylor*, 959 F.2d 539, 548 (5th Cir. 1992). Moreover, Defendants threatened that if Alexis did not pay up, she would be detained for nearly *two weeks* thereafter, which would have violated Alexis's right to a probable-cause hearing within forty-eight hours of detention, as required by the United States Supreme Court in *McLaughlin*.

129.    Instead, Defendants purposefully withheld a probable-cause hearing from Alexis for illegitimate purposes, motivated by "ill will" toward her. Defendants intentionally delayed their detention of Alexis (i) to extort her into paying bogus "fines" and (ii) to "teach [Alexis] a lesson." As to the latter motivation, Defendants sought to make an example out of Alexis to others who would question the LPD's authority and to punish her for playing a role—through her niece's recording—in exposing the LPD's discriminatory policing practices.

130.    Defendants unlawfully detained Alexis in accordance with and in furtherance of their "Stop-and-Fine" policy.

131.    In depriving Alexis of her rights under the Fourth Amendment, Defendants acted with evil intent and reckless indifference for Alexis's constitutional rights under color of law in their respective capacities as Lexington police officers, and their actions and omissions were conducted within the scope of their respective official duties or employment. This deprivation under color of law is actionable under, and may be redressed by, 42 U.S.C. § 1983.

## COUNT VI (42 U.S.C. § 1983)

### Unreasonable Seizure of Property in Violation of the
### Fourth and Fourteenth Amendments
### (asserted against Defendants in their individual and official capacities)

132.    Alexis incorporates by reference and realleges all prior paragraphs of this Complaint and the paragraphs in the counts below as though fully set forth herein.

133.    Defendants' extortion of $1,283 in exchange for Alexis's release from detention deprived Alexis of her clearly established right to be free from the unreasonable seizure of her property under the Fourth Amendment, as made applicable to the states by the Due Process Clause of the Fourteenth Amendment.

134.    It is clearly established that state actors may not seize personal property without probable cause that the property is connected to criminal activity, or that the property is necessary to advance certain other "special law enforcement needs . . . [that] may render a warrantless search or seizure reasonable." *Illinois v. McArthur*, 531 U.S. 326, 330 (2001). A "seizure" of property is a "meaningful interference with an individual's possessory interests in [the] property." *Morris v. Livingston*, 739 F.3d 740, 752 (5th Cir. 2014) (citations omitted).

135.    Alexis's "forced disclaimer of [her] property [*i.e.*, the $1,283] is a seizure." *Craig v. St. Martin Par. Sheriff*, 861 F. Supp. 1290, 1297 (W.D. La. 1994) (coercing a detained individual into signing a disclaimer of property in exchange for release from detention was a "seizure").

136.    Defendants' imposition of a bogus "fine" meaningfully and permanently deprived Alexis of her right to that money. The cash payment to Defendants was far from trivial for Alexis—but for her sister's assistance, Alexis could not have paid the demanded amount and would have been forced to spend nearly two weeks in jail. For the same reason, the "choice" Defendants offered to Alexis—stay in jail or pay the bogus "fine"—was illusory, as remaining in jail during the holidays without the ability to care for her son and grandmother was not a viable option. Finally, Defendants made clear to Alexis's sister that the cash payment was not a "bond"—an amount that authorities ordinarily return if the criminal defendant is not convicted of a crime. Alexis was never properly convicted, but Defendants have not returned the cash.

137.    Defendants' interference with Alexis's property was also unreasonable, as Defendants lacked probable cause to arrest and detain her in the first instance. And because the "fine"—by Defendants' own admission—was not a bond or bail, and therefore was not intended to ensure Alexis's appearance in court at a future date, the deprivation of her property could not have advanced any legitimate government interest. The absence of any conceivable governmental interest in demanding the $1,283 reinforces that Defendants seized Alexis's property for illegitimate purposes, including financial gain and discriminatory animus towards her.

138.    Defendants unlawfully seized Alexis's property in accordance with and in furtherance of their "Stop-and-Fine" policy.

139.    In depriving Alexis of her rights under the Fourth Amendment, Defendants acted with evil intent and reckless indifference for Alexis's constitutional rights under color of law in their respective capacities as Lexington police officers, and their actions and omissions were

conducted within the scope of their respective official duties or employment. This deprivation

under color of law is actionable under, and may be redressed by, 42 U.S.C. § 1983.

## COUNT VII (42 U.S.C. § 1983)

**Deprivation of Liberty and Property Without Due Process of Law in Violation of the Due
Process Clause of the Fourteenth Amendment
(asserted against Defendants in their individual and official capacities)**

140.    Alexis incorporates by reference and realleges all prior paragraphs of this

Complaint and the paragraphs in the counts below as though fully set forth herein.

141.    Defendants' extortion of $1,283 from Alexis was a denial of her clearly established

right to be free from the deprivation of her liberty and property without due process of law under

the Due Process Clause of the Fourteenth Amendment.

142.    Whether a deprivation of liberty or property interest violates due process depends

on: (1) "the private interest that will be affected by the official action," (2) "the risk of an

erroneous deprivation of such interest through the procedures used," and (3) "the Government's

interest, including the function involved and the fiscal and administrative burdens that the

additional or substitute procedural requirement would entail." *Mathews v. Eldridge*, 424 U.S. 319,

335 (1976).

143.    It is clearly established that conditioning one's release from jail on the surrender of

property requires process that includes, at a minimum, notice and an opportunity to be heard and

contest the deprivation. *See, e.g., Craig*, 861 F. Supp. at 1297 (holding it was "clearly established"

that an arrestee may not be coerced into signing a disclaimer of interest in seized property in

exchange for release from jail without due process of law) (citing *Brewer v. Blackwell*, 692 F.2d 387,

399 (5th Cir. 1982)).

144.    First, the private interests at stake for Alexis are far from trivial: (1) a property interest in the $1,283 and (2) a liberty interest in being free from detention absent due process. As set forth above, Defendants' taking of Alexis's money meaningfully and permanently deprived Alexis of her right to that money. Moreover, "conditioning release on the waiver of property violates a suspect's right to liberty." *Id.*

145.    Second, the risk of erroneous deprivation due to Defendants' "Stop-and-Fine" scheme is exceedingly high, as Defendants coerced Alexis into surrendering her money without any process at all, for bogus charges that she was never afforded the opportunity to contest. Alexis never appeared before a judge, was never given notice that any proceedings adjudicating the charges for which she was fined were taking place or that payment of her fines would be final and irreversible, and was never afforded any procedure to recover the fine after she paid it.

146.    Third, there is no legitimate governmental interest in conditioning release from detention on cash payments without notice or the opportunity to contest the deprivation. To the contrary, Defendants conceded to Alexis's sister that the fine was *not* a bond and thus could not have been designed to "insure the defendants' attendance at trial." *Cf. Gladden v. Roach*, 864 F.2d 1196, 1200 (5th Cir. 1989) (requiring bond for non-jailable offense did not violate due process principles because the bond was still designed to further the legitimate interest of ensuring appearance at trial). The facts and circumstances of Alexis's arrest—including Defendants' broader pattern of manufacturing charges against Lexington residents for the purpose of extracting cash fines—suggest that the lack of judicial process was a feature, not a bug, of Defendants' policing and money-making scheme.

147.    Defendants unlawfully deprived Alexis of her liberty and property in accordance with and in furtherance of their "Stop-and-Fine" policy.

148.    In depriving Alexis of her rights under the Fourteenth Amendment, Defendants acted with evil intent and reckless indifference for Alexis's constitutional rights under color of law in their respective capacities as Lexington police officers, and their actions and omissions were conducted within the scope of their respective official duties or employment. This deprivation under color of law is actionable under, and may be redressed by, 42 U.S.C. § 1983.

## COUNT VIII

### Conversion of Personal Property or Chattel
### (asserted against Defendants in their individual capacities)

149.    Alexis incorporates by reference and realleges all prior paragraphs of this Complaint and the paragraphs in the counts below as though fully set forth herein.

150.    A plaintiff may assert a claim for conversion where (1) there is a wrongful possession; (2) in exclusion or defiance of the owner's right; and (3) the title of the lawful owner is known. *Covington Cnty. Bank v. Magee*, 177 So. 3d 826, 829 (Miss. 2015).

151.    Defendants' coerced collection of $1,283 under the threat of prolonged detention constitutes a wrongful possession of property to the exclusion or defiance of Alexis's superior right to that amount. Defendants deprived Alexis of that money knowing full well that she was entitled to keep it, and with the intent to "teach [Alexis] something." Defendants' wrongful possession of Alexis's property was motivated by malice towards her.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff respectfully requests that the Court enter a judgment providing the following relief:

- all recoverable damages in amounts to be determined at trial, including compensatory damages, punitive damages (individual-capacity claims only), and nominal damages;

- an award of costs, reasonable attorney's fees, and post-judgment interest;

- a declaration that Defendants have violated Plaintiff's rights as guaranteed by the Fourth and Fourteenth Amendments to the United States Constitution;

- a declaration that Defendants unlawfully converted Plaintiff's personal property, in violation of Mississippi state law;

- a permanent injunction against Defendants in their individual capacities, and against Henderson in his official capacity, enjoining and restraining Defendants from interfering with Plaintiff's rights under the U.S. Constitution and Mississippi law, including (1) by searching, seizing, arresting, and imprisoning Plaintiff without probable cause or on pretextual grounds; (2) by detaining Plaintiff without a prompt probable-cause hearing; and (3) by soliciting or accepting payments of any kind from Plaintiff, except in strict compliance with local laws and ordinances, the laws and Constitution of Mississippi, and the laws and Constitution of the United States; and

- such other and further relief as the Court may deem just and appropriate.

## JURY DEMAND

Plaintiff respectfully demands trial by jury for all triable matters.

Date: October 3, 2023

_____

JOSHUA TOM (MS Bar No. 105392)
ACLU OF MISSISSIPPI
P.O. Box 2242
Jackson, Mississippi 39201
Telephone: (601) 354-3408
Fax: (601) 355-6465
jtom@aclu-ms.org

*Attorney for Plaintiff Alexis Jew*