# IN THE UNITED STATES DISTRICT COURT
# FOR THE SOUTHERN DISTRICT OF MISSISSIPPI
# NORTHERN DIVISION

**ALEXIS JEW**,

        *Plaintiff*,

v.

**SAM DOBBINS, in his individual capacity; CHARLES HENDERSON, in his individual capacity and in his official capacity as interim and current Chief of Police of the Lexington, Mississippi Police Department; and THE CITY OF LEXINGTON, MISSISSIPPI,**

        *Defendants*.

CAUSE NO. 3:23-CV-2983-CWR-LGI

## ORDER

Before the Court are motions for judgment on the pleadings filed by Defendants Sam Dobbins, Charles Henderson, and the City of Lexington, Mississippi. Docket Nos. 18 and 38. The motions are fully briefed and ready for adjudication. Upon review, the motions will be denied without prejudice and this matter will be stayed.

**I.    Factual and Procedural History**

Lexington is a small town in Holmes County, Mississippi. Fewer than 2,000 people live there, and the number seems to be decreasing year over year.

Like many areas of the Mississippi Delta, Lexington has a history of segregation and race-based socioeconomic stagnation. "Black People in Lexington lived under the demands and threats of Jim Crow-era segregation." U.S. Dep't of Just. Civ. Rights Div., *Investigation of the Lexington Police Department and the City of Lexington, Mississippi* 5 (Sept. 26, 2024). Those

who grew up in that era recalled "an age when [Black] children and teenagers . . . were often held in [the] city jail for no reason other than to be 'taught lessons.'" *Id. (*quoting Chalmers Archer Jr., GROWING UP BLACK IN RURAL MISSISSIPPI: MEMORIES OF A FAMILY, HERITAGE OF A PLACE 13, 125 (1992)).

Alexis Jew is a 40-year-old Black woman and Lexington native. On December 14, 2021, Jew, who lived in Greenwood, Mississippi at the time, traveled to Lexington to shop and visit family. She traveled in a rented truck with Texas plates.

The events that led to this lawsuit began ordinarily enough. Jew stopped for gas, parked at a pump, and went inside the store. She paid for her gas and returned to her truck. While waiting for her tank to fill, she returned to the store to buy a refreshment. Realizing that she did not have change on her, she once again went outside. It was then that Jew noticed Lexington Police Chief Sam Dobbins[1] and Officer Charles Henderson standing behind her truck. She contends she had done nothing to arouse or invite police attention. Docket No. 12 ¶ 54.  She had not been disruptive, disorderly or otherwise suspicious. *Id*. All she had done was pay for her gas.

As she reached the pump, Officer Henderson "demanded" that Jew provide her driver's license. *Id.*  ¶ 55. Jew asked him why he needed it.  He did not respond. At this point, Chief Dobbins stated, "When the police ask you to do something, you do it." *Id.* Jew responded, "You right" and began to reach for her license. *Id.* Officer Henderson then suddenly grabbed Jew by the arm, pushed her onto the front of a nearby car, and handcuffed her, as Jew pleaded, "Wait a minute, let me get my license." *Id.* ¶ 56.

---

[1] Chief Dobbins is no longer employed by the Lexington Police Department for reasons addressed below. But because he was Chief of Police at the time of this encounter, the Court will refer to him as Chief Dobbins.

2

Jew's niece captured portions of the encounter on video. Docket No. 18-1. Jew alleges Officer Henderson forcibly spread her legs and attempted to stick his hand in her pocket to grab her wallet. Jew can be heard on video stating "Don't touch my wallet" to which Officer Henderson responds, "No I'm not finna touch your wallet." Docket No. 18-1 at 00:16-00:20. Then, either Chief Dobbins or Officer Henderson said, "You're going to go to jail for failure to comply." *Id.*[2] at 00:20-00:23.

Onlookers gathered. Officer Henderson yelled at Jew and the onlookers saying, "Y'all gonna quit playing with the police" and "Imma show y'all today!" *Id.* ¶ 58. The Court does not hear this exchange on video. The Court, however, is hesitant to weigh in on what happened given the angle and incomplete nature of the video. Because Jew's version of the events is not so utterly discredited by the video that no jury would believe her, the Court must accept Plaintiff's allegations at this early juncture. *Scott v. Harris*, 550 U.S. 372, 381 (2007).

While handcuffed, Jew asked her niece to retrieve another state identification card from her pocket. Doc. 12 ¶ 59. Chief Dobbins threatened to mace Jew's niece if she attempted to retrieve it. *Id.* Although it is unclear from the video whether Chief Dobbins made this statement, Jew's niece can be heard shouting, "Spray me! Spray me!" as Officer Henderson says "I'm gonna tell you again; you better get some understanding" and holds a small black object in his hand. Docket No. 18-1 at 00:23-00:28.

The video ends here. The remaining allegations, therefore, are drawn from Jew's amended complaint. As Officer Henderson walked Jew to his police car, Chief Dobbins

---

[2] Jew's niece can also be heard in the background saying Jew asked her to retrieve the identification card. Therefore, it is possible that the officers were telling both women they would go to jail for failing to comply.

3

shouted, "Oh yeah, Texas?!—referring to her Texas license plate. "We finna get this one too!" Docket No. 12 ¶ 60. Jew responded, "How you going to take my truck? You can't take my truck!" *Id.*

While in the police car, Officer Henderson asked Jew her name. Jew, who was recently divorced, believed her identification card listed her married name, Gibson. So, she replied that her name was Alexis Gibson. At the station, however, Officer Henderson finally looked at Jew's identification card. It showed her maiden name, "Jew," so Officer Henderson accused her of lying. Jew protested and emphasized that the discrepancy stemmed from her recent divorce. She also attempted to explain her deep family roots and connections to Lexington, to no avail. She also pleaded that she needed to get back to Greenwood to pick up her son.

Chief Dobbins entered the holding area, reviewed Jew's arrest paperwork, and told Officer Henderson, "Easy money, easy money, twelve eighty-three, all cash, all cash." *Id.* ¶ 64. Jew asked the Chief if this meant she would have to pay $12.83. Officer Henderson explained that she would need to pay $1,283 in cash—one hundred times as much as her guess—before she would be released.

Jew said she didn't have that much money, but Officer Henderson warned her that, "If you don't have that you're gonna be here until Christmas." *Id.* Jew says neither officer explained the basis of the payment or offered her a bond to ensure her appearance at future court proceedings.

Officer Henderson transported Jew to the Holmes County Jail soon after. He informed her she would spend the next two weeks there if she could not pay the $1,283. An employee told Jew she needed to apologize to Officer Henderson to get out. Heeding this advice, Jew

4

apologized. Officer Henderson responded that he was "going to teach [her] something." *Id.* ¶ 65. And because he was aware Jew's niece had recorded the stop and arrest, Officer Henderson also stated, "Yeah, y'all like using those cameras and recording and stuff. Y'all like to get the news people." *Id.* Jew, though, was confused as she was not aware of a recording.

Jew was processed and spent the night in the Holmes County Jail. At some point that night, her cousin visited the Lexington Police Station to check on her, but Chief Dobbins told him that Jew was no longer in detention. *Id.* ¶ 67. The next morning, Jew's sister Querrida Johnson visited the station. She was informed that Jew did not have the option to pay a bond and would need to pay $1,283 to be released. Ms. Johnson also spoke with Mayor Robin McCrory who told her she would not be able to pay a bond for Jew's release. Ms. Johnson paid $1,283 and Jew was released.[3] Neither was given a receipt.

As Jew was released, Lexington Police Department officials gave Ms. Johnson paperwork instructing Jew to appear at the Lexington Municipal Court on or around December 18, 2021. Jew contracted COVID-19 between her release and appointed court date but still went to the courthouse on the designated date. She informed court staff of her diagnosis and was told to wait in the car while they made copies of her driver's license, marriage certificate, and Lexington Police Department documents reflecting her scheduled court date. Jew did not appear before a judge that day. Instead, court staff returned her license and marriage certificate and directed her to return home. They, however, did not return the document reflecting Jew's scheduled court.

---

[3] Jew alleges this money was deposited into the Lexington Police Department's account at the Holmes County Bank and not filed with the Holmes County Clerk of Court. Docket No. 12 ¶ 78.

Noone from the police department or the municipal court ever contacted Jew to give her a court date or even to update her on the charges. Jew spent the next year attempting to get an update on her case. She was never arraigned or appeared before a judge. *Id.* ¶ 72. In November 2022, court staff informed her that she had been found guilty of "obstruction of justice' and "providing false information to the police,' and that she had already paid the requisite fines." *Id.* ¶ 73. Jew alleges that these convictions are fictitious. She "received no notice of the purported charges against her, [and had] no opportunity to defend herself" against the charges. *Id.*

In Jew's telling, there is little to no documentary evidence showing the disposition of her charges. An "arrest report" reflects that Jew was "found guilty in her absents [sic] and cash bond posted towards fine" before Judge Boutwell. *Id.* ¶ 74. The "arrest report" further states that Jew paid $659.25 as a "fine plus assessments" for the false identifying information charge and $624.25 as a "fine plus assessments" for the disorderly conduct charge. *Id.* ¶ 75.

In response to a formal request submitted under Mississippi's Public Records Act, the City of Lexington and Lexington Municipal Court told Jew that they do not possess any certificates of disposition or other records reflecting a conviction based on Jew's arrest. *Id.* ¶ 81. Jew thus maintains that she has not been convicted of any charge in connection with her December 14, 2021, arrest. She never received notice of a December 30, 2021, court date and police department personnel "made clear to [her] and her sister that the money collected from [her] was not a bond." *Id.* ¶ 82.

There is more. According to Jew, her encounter with Chief Dobbins and Officer Henderson is consistent with the Lexington Police Department's years-long pattern of violence and coercion. In 2011, the Lexington Police Department held a community meeting

6

to address concerns of police misconduct and provide residents with methods to report misconduct. Justin Purdy, *Lexington Police Offer Avenues for Complaints at Local Meeting*, HAMILTON CNTY. HERALD (Aug. 18, 2011).

A recent investigation[4] by the U.S. Department of Justice sheds light on the situation in Lexington. The Department of Justice found that the Lexington Police Department "aggressively polices low-level crimes and traffic offenses." U.S. Dep't of Just. Civ. Rts. Div., *Investigation of the Lexington Police Department and the City of Lexington, Mississippi* 8 (Sept. 26, 2024). Many individuals are arrested for these low-level crimes and traffic offenses. Upon arrest a person "must pay a $50 processing fee to get out." *Id.* at 23. After paying for old fines, to the extent there are any, the person must then "bond out." *Id.* There are two different ways a person may bond out according to the DOJ. First, a person "can pay money bail" to the court and have this money returned "when the person appears for trial. *Id.* As most individuals in Lexington do not have this money on hand, they are often forced to turn to a bail bondsman. Alternatively, individuals may "pay all or part of the new fines associated with their arrest *directly to the LPD.*" *Id.* These individuals "almost never appear in court" but "the [Lexington Police Department] enters a guilty plea on the charges, and the person has a criminal conviction on their record." *Id.*

Jew's amended complaint describes this as the City's "Stop-and-Fine" policy. Docket No. 12 ¶ 26. She says the escalation began in 2021, when Dobbins was appointed Chief of

---

[4] This is, at least, the second DOJ investigation in Lexington. The first occurred in the 1960s after Hartman Turnbow's home was firebombed because he attempted to register to vote. U.S. Dep't of Just. Civ. Rts. Div., *Investigation of the Lexington Police Department and the City of Lexington, Mississippi* 5 (Sept. 26, 2024). Instead of protecting Mr. Turnbow, the county sheriff arrested him and charged him with arson of his own home. *Id.* These charges were not dropped until officials from the Department of Justice intervened. *Id*

Police. According to Jew, Chief "Dobbins had a well-documented history of racist comments and discriminatory policing" which included being terminated from his role as a sheriff's deputy in a nearby county. *Id.* ¶ 19. Chief Dobbins's goal in Lexington was to generate revenue for the city, she says, and he accomplished this goal. In his first month on the job, revenue from traffic fines increased from around $2,500 to over $15,000. *Id.* ¶ 28. By September 2021, the City reported $70,749 in cash receipts from fines and forfeitures. Off. of the State Auditor, *City of Lexington, Mississippi Audited Financial Statements* 4 (Sept. 30, 2021). One year later, the City reported cash receipts of $240,983 from the same. Off. of the State Auditor, *City of Lexington, Mississippi Audited Financial Statements* 5 (Sept. 30, 2022).

Chief Dobbins's efforts attracted scrutiny. In 2022, someone leaked to the press a recording of him using discriminatory remarks like "f****t", "n****r"[5], and boasting about killing numerous individuals—one of whom he claimed to have shot 119 times. Docket No. 12 ¶ 21. The City fired him and promoted Officer Henderson to Chief, even though he was considered Chief Dobbins's "second-in-command" and has his own history of perpetrating violent acts. *Id.* ¶ 23. Jew alleges that Henderson has continued the Lexington Police Department's discriminatory and violent practices.

In this action, Jew specifically charges Chief Dobbins and Officer Henderson with unreasonable search and seizure, false arrest, unreasonable search incident to arrest, excessive force, excessive detention without probable cause hearing, unreasonable seizure of property, deprivation of liberty and property without due process, and conversion.

---

[5] Various sources reporting this occurrence censored Chief Dobbins's words, undoubtedly because of their sensitive nature. Yet, Chief Dobbins clearly and proudly referred to individuals he was sworn to protect as faggots and niggers.

Additionally, Jew asserts the City of Lexington is responsible because Chief Dobbins and Officer Henderson's actions reflect a supported custom or practice of constitutional violations.

Defendants have moved for judgment on the pleadings as to all claims. All argue that Jew's payment of $1,283 bars her from pursuing this civil action under the principles of *Heck v. Humphrey*, 512 U.S. 477 (1994)—colloquially known as "the *Heck* bar." Officer Henderson and Chief Dobbins assert that they are entitled to qualified immunity. And the City of Lexington contends that Jew has not presented sufficient allegations to hold it liable under *Monell v. Dep't of Soc. Servs.*, 436 U.S. 658 (1978).

## II.   Legal Standard

"After the pleadings are closed---but early enough not to delay trial---a party may move for judgment on the pleadings." Fed. R. Civ. P. 12(c).

> The standard for deciding a Rule 12(c) motion is the same as a Rule 12(b)(6) motion to dismiss. The Court accepts all well-pleaded facts as true, viewing them in the light most favorable to the plaintiff. The plaintiff must plead enough facts to state a claim for relief that is plausible on its face. Factual allegations must be enough to raise a right to relief above the speculative level, on the assumption that all allegations in the complaint are true (even if doubtful in fact).

*Giles v. Dedmon*, No. 3:21-CV-766-CWR-LGI, 2022 WL 17420387, at *2 (S.D. Miss. Dec. 5, 2022) (citing *Guidry v. Am. Pub. Life Ins. Co.*, 512 F.3d 177, 180 (5th Cir. 2007)).

"The Court does not, however, presume true . . . legal conclusions; mere labels; threadbare recitals of the elements of a cause of action; conclusory statements; and naked assertions devoid of further factual enhancement." *Harmon v. City of Arlington, Tex.*, 16 F.4th 1159, 1162 (5th Cir. 2021) (citation omitted). And "where video recordings are included in the pleadings, as is the case here, the video depictions of events . . . should be adopted over the

9

factual allegations in the complaint *if* the video 'blatantly contradict[s]' those allegations." *Id.* at 1163 (citation omitted) (emphasis added).

## III. Discussion

Today's analysis begins and ends with *Heck v. Humphrey*. The Court cannot determine whether the *Heck* bar applies, as it is not clear whether Jew has a conviction arising out of the events of December 14, 2021.

"It is well settled under *Heck* that when an individual . . . brings a [§ 1983] claim against the arresting officers and their supervisors, the district court must first consider whether a judgment in favor of the plaintiff would necessarily imply the invalidity of his conviction or sentence. *Connors v. Graves*, 538 F.3d 373, 376 (5th Cir. 2008) (citations omitted). If a civil judgment *would* imply the invalidity of the criminal conviction, "the [civil] claim is barred unless he proves that his 'conviction or sentence has been reversed on direct appeal, expunged by executive order, declared invalid by a state tribunal authorized to make such determination, or called into question by a federal court's issuance of a writ of habeas corpus.'" *Id.* (quoting *Heck,* 512 U.S. at 487).

The Fifth Circuit recently clarified that under *Heck*, "favorable termination is one element of a § 1983 claim. Unless and until the plaintiff can prove that element, the plaintiff has no claim." *Wilson v. Midland Cnty., Tex.*, No. 22-50998, 2024 WL 4178185, at *13 (5th Cir. Sept. 13, 2024). Thus "all § 1983 suits challenging tainted convictions and sentences must run *Heck's* favorable-termination gauntlet—regardless of whether the alleged taint is procedural or substantive." *Id.* at *7.

In our case, Defendants argue that Jew's claims are barred because (in their view) she paid a $1,283 fine for disorderly conduct and presentation of false identifying information.

10

They submit that the payment is evidence that Jew's claims are "disguised challenges to her state court conviction." Docket No. 39 at 6. Chief Dobbins states that her payment of a fine related to her arrest "is the functional equivalent of a nolo plea and/or conviction" which triggers *Heck*. Docket No. 49 at 2.

Jew disagrees. The *Heck* bar does not apply, she says, because "there was no underlying litigation and there was no conviction." Docket No. 45 at 14. Jew observes that there is no record of conviction in the Lexington Municipal Court. *Id.* at 15. She also disputes that paying a fine equates to a plea of nolo contendere—*i.e.*, a "no contest" plea—because such a plea must be knowingly and intelligently made in open court after the defendant is advised of their rights. *Id.* That didn't happen here.

The Court has reviewed the applicable precedent. Defendants are correct that a plea of nolo contendere "is a conviction that implicates *Heck*." *Oliver v. City of Brandon*, No. 22-60566, 2023 U.S. App. Lexis 22506, at 3 (5th Cir. Aug. 25, 2023). It also is true that in Mississippi, "payment of a typical traffic fine . . . may be . . . akin to a plea of nolo contendere." *Owens v. Kelly*, 191 So. 3d 738, 744 (Miss. Ct. App. 2015) (collecting authorities). That makes sense. But it is not clear that Jew's payment of $1,283 was a typical fine.

The analysis begins with *Owens*. In that case, a child riding with his grandmother sued a truck driver for injuries sustained in a car wreck. The truck driver claimed that the grandmother was at fault. So at trial, he sought to impeach her with evidence that she had received—and paid—a traffic ticket issued following the accident. The trial court agreed. It ruled that the grandmother's payment of the ticket could be "used basically more for impeachment than . . . to prove any kind of liability." *Id.* at 741.

11

The Mississippi Court of Appeals affirmed. "[T]he defendants clearly had a right to cross-examine her as to her payment of the fine without [her] insisting on a trial," it held. *Id.* at 742 (cleaned up). But the Court of Appeals added a cautionary note. Its review of Mississippi law did *not* conclusively reveal "a broad rule that the payment of a fine resulting from a traffic citation is always admissible substantive evidence of fault or negligence in a civil case arising out of the same incident." *Id.* at 744 (citing *Seals v. St. Regis Paper Co.*, 236 So. 2d 388, 392 (Miss. 1970)).

Our case is different from *Owens*. Here, Defendants are not trying to use a payment to prove civil negligence, they are trying to use it to prove a form of *criminal* culpability. And if the Mississippi courts are hesitant to let payments prove civil liability, they necessarily will be more hesitant to let payments prove criminal liability. It is harder to prove criminal cases than civil cases. Criminal cases must be proved beyond a reasonable doubt while civil cases are proved by lesser standards.

In any event, Jew was arrested and detained in jail until she made an immediate payment of $1,283. That is not disputed. What the parties and the Court plainly need clarity on, though, is whether that $1,283 payment was for a bond or a fine.[6]

Consider the differences. A bond is temporary. It's paid at the time of pretrial release to secure your appearance at future court proceedings. Jew says she had future court appearances that she did, in fact, return to Holmes County for—suggesting that the payment was a bond. Payment of a traffic ticket, in contrast, can be done from the comfort of your

---

[6] It seems undisputed from the pleadings that Jew never walked into a courtroom and formally entered a no contest plea before a neutral judicial officer. The outstanding question is whether her payment was *akin* to a no contest plea.

12

home, days or weeks after the citation, and is final. It doesn't matter whether you are paying because you wish to admit fault (*i.e.*, "pleading guilty") or simply wish for the proceedings to end (*i.e.*, "pleading no contest"), because you are achieving *finality*. If Jew was paying a fine for finality, though, why would she appear for court on December 18, 2021? And why is there no record of the disposition of her case?  *See* MRCrP 26.5(a) and 26.8.

There are simply too many atypical occurrences to conclude that Jew's payment for her release constituted a plea of nolo contendere.[7] And if Jew was never convicted, then *Heck* does not bar her claims.[8] *Heck* cautions the Court from interfering with the judgment of a state court, but *Heck* cannot be implicated where there is no "outstanding criminal judgment" to begin with. *See Wallace v. Kato*, 549 U.S. 384, 393 (2007).

The Court now asks the parties to confer and seek to reach consensus, if at all possible, on whether Jew was convicted of any crime for the events of December 2021.

Mississippi law indicates that the determination of guilt may be completed by (1) a verdict of guilty by a jury, (2) a finding of guilt by a court following a non-jury trial, (3) or the acceptance by the court of a plea of guilty or nolo contendere. MRCrP 26.1(a). Such a finding must be incorporated into the court's judgment, *id.* at 26(b), which must be pronounced in open court in the presence of the defendant and recorded in the minutes,[9] *id.* at 26.5(a).

---

[7] Defendants have pointed to other district court cases holding that no contest pleas can trigger the *Heck* bar. *See Sheppard v. City of Alexandria*, No. 10-1396, 2012 WL 3961820 (W.D. La Sept. 10, 2012); *Wallace v. Lee*, No. Civ. A. 00-3759, 2002 WL 31175219 (E.D. La. Sept. 27, 2002). That is consistent with Fifth Circuit precedent. *See Oliver*, *supra*. But these cases do not support the proposition Defendants need: that the payment Jew made was a fine equivalent to a no contest plea.

[8] Because conviction relates to a legal status, the Court is not required to accept either party's assertion as true. *See Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).

[9] MRCrP 10.1(b) outlines how a defendant may waive their right to be present for a proceeding. But as Jew alleges she had no knowledge that a hearing was set to occur, she could not have waived her right to be present.

Here the Court has no information establishing that Jew's case was adjudicated. The "arrest report"[10] itself does not establish such adjudication. In fact, Jew alleges that Lexington officials could find no record of a final disposition. The charges against Jew may still be pending in the state-court system.

"In cases such as Plaintiff's where charges remain pending, federal courts have been authorized to stay civil rights claims attacking the legality of a detainee's arrest, prosecution, and detention until such time as the allegedly improper state prosecution has been concluded." *Banks v. Oxygen*, No. 23-1186-P, 2024 U.S. Dist. Lexis 27308, at *4 (W.D. La. Feb. 2, 2024); *see also Wallace*, 549 U.S. at 393-94. A stay is appropriate here since it is unclear that the underlying state case has run its course. *See Mackey v. Dickson*, 47 F.3d 744, 746 (5th Cir. 1995). As the Fifth Circuit put it in that case, "it is simply premature to determine" whether Jew's claims are barred under *Heck*. Accordingly, this matter will be stayed until any charges based on Jew's December 2021 arrest are resolved in the Lexington Municipal Court.

## IV. Conclusion

The motions are denied without prejudice. This matter is stayed until the status of Jew's charges is firmly and finally resolved. Within 30 days of the close of the state-court matter and all its appeals, if any are taken, the parties shall file a status update in this Court.

**SO ORDERED**, this the 29th day of October, 2024.

s/ Carlton W. Reeves  
UNITED STATES DISTRICT JUDGE

---

[10] Without delving too deep into the arrest report, the Court also notes that the report contains discrepancies regarding what Jew was arrested for, charged with, and ultimately "convicted" of.